IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALICIA M. MURPHY,                    )
                                     )
            Plaintiff,               )
                                     )
                                     )
      vs.                            )      CIVIL CASE NO. 08-477-JPG-PMF
                                     )
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
            Defendant.               )

## REPORT AND RECOMMENDATION

**FRAZIER, Magistrate Judge:**

Plaintiff, Alicia M. Murphy, seeks judicial review of a final decision of the Commissioner of Social Security denying her September, 2002, application for supplemental security income.

## I.      Procedural History

This is the second decision denying Murphy's application.  The first decision resulted in a finding that Murphy was not disabled.  That decision was reviewed in *Murphy v. Astrue*, Case No.06-143-GPM (S.D.Ill. 2007).   On September 28, 2007, Judge Murphy reversed the Commissioner's decision and remanded the case for further administrative proceedings.[1]

On remand, the Appeals Council vacated the first decision and ordered a new decision (R. 411).  The case was referred to the Administrative Law Judge (ALJ), who scheduled a

---

[1] The ALJ's credibility assessment was based, in part, on an erroneous belief that Murphy's HIV ailment had not advanced to a "full-blown" case of AIDS.  The inaccurate report of Murphy's physical condition was attributed to a misunderstanding of the medical evidence, which led the ALJ to discredit Murphy's testimony.

supplemental hearing.  On February 20, 2008, Murphy testified at the supplemental hearing.  The ALJ also heard testimony from medical and vocational experts.

On March 7, 2008, the ALJ announced a new decision, again finding that Murphy was not disabled.  That decision became the Commissioner's final decision when the Appeals Counsel declined to review the ALJ's findings (R. 393-406).   Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) and §1383(c).

## II.     Evidence in the Administrative Record

The relevant portions of the administrative record are summarized as follows.   In December, 1999, plaintiff tested positive to HIV, the human immunodeficiency virus.  She was seen by Dr. Rajagepal, who treated her over a period of approximately seven months for anemia, a rash, and diarrhea (R. 188-193).

In September, 2002, plaintiff started taking HIV medications.  She signed a statement that her AIDS medicines made her feel dizzy, drowsy, and forgetful.  She was hospitalized several times for substance abuse, fever, and depression (R. 63, 90, 141-152, 162-178).

In November, 2002, plaintiff signed a statement that she prepared simple meals two times a day and did vacuuming and dusting one time a day.  She was able to walk and left home everyday but did not shop.  She took care of her personal needs.  She read often but did not drive.  She rarely or never made repairs, played cards or games, attended church or sports events, watched television, listened to a radio, talked to neighbors, dined out, watched movies, or attended classes (R. 76-78).

At some point, plaintiff signed a form indicating that her condition had changed due to fatigue and chronic tiredness.  At that time, she was taking Kaletra, Combivir, Bactrim, and Viread (R. 104, 106).

2

In February, 2003, plaintiff underwent a psychiatric evaluation, explaining that her main physical symptom was chronic fatigue, with additional problems maintaining concentration.  She was diagnosed with an adjustment disorder, a history of chronic alcoholism, and a history of cocaine abuse (R. 183-84).

In May, 2003, Drs. Travis and Vincent reviewed plaintiff's medical records and formed the impression that she could perform light work (R. 292-299).

In August, 2003, Dr. Badahman examined plaintiff and diagnosed HIV, persistent anemia, sinus congestion, and persistent disease of the lymph nodes.  She was started on anti-HIV medications, including an AZT regimen (R. 194-95, 247).

In September, 2003, plaintiff was treated for symptoms of fatigue and sore throat (R. 198).  When she described her medical history, she reported headache, heart murmur, chest pain, dizziness, bronchitis, lactose intolerance, bowel irregularity, frequent infections, anemia, nervousness, and depression (R. 197).

Also in September, 2003, plaintiff described her condition in a disability report.  She reported memory loss, dizziness, loss of appetite, weight loss, extreme tiredness, various types of infection, sleep disturbance, weakness, forgetfulness and difficulty with concentration.  At that time, plaintiff was being treated for depression (R. 92-94).

Also in September, 2003, plaintiff was seen for follow-up.  She described a loss of appetite, and her medications were adjusted (R. 200).

In October, 2003, plaintiff signed a report stating that she experienced a loss of appetite, nausea or diarrhea.  She made her bed and did cleaning chores once a day but felt tired all the time and was out of breath.  She was not sleeping well and had nausea and night sweats.  She reported a few daily activities but described fatigue and weakness, which she attributed to her

3

disease and her medications.  After she took her medicines, she needed assistance with standing, walking and balancing.  She needed rest periods during the day but did some household chores. She did no yard work or home repair and did not play sports or use exercise equipment (R. 96-99, 101-103).

Several days later, plaintiff was treated for severe anemia after complaining of general malaise, aches, and dizziness.  She reported no nausea, vomiting, bloody stools, headache, shortness of breath, respiratory difficulty, itching, chest pain, or back pain.  She was admitted for blood transfusion and iron supplementation.  Her physicians formed the impression that her rapid hemoglobin decline was linked to her AZT medication, secondary to bone marrow suppression. Her medical assessment was reported as HIV AIDS – currently stable, severe anemia, and depression.  Her medications included Kaletra, Combivir, Bactrim DS, Trazodone, Prevacid, and Clarinex.  She received a blood transfusion (R. 244-272).

In November, 2003, Dr. Travis re-reviewed plaintiff's medical records and formed the impression that she retained the ability to perform light work (R. 299).

In December, 2003, plaintiff was seen for symptoms of cough, fever, body aches, and chest pain with breathing or coughing.  She was given Tylenol and was advised to alternate between Motrin and Tylenol for fever (R. 238-241).

In January, 2004, plaintiff was seen for follow-up.  She was doing well on new HIV/AIDS medications: Kaletra, Epivir, and Viread.  Her iron deficiency anemia medications were Ferusol and Colace, and she was also taking Bactrim DS and Prevacid.  She complained only of occasional gas (R. 300).

At some point, plaintiff signed a form indicating that her condition had changed due to fatigue and chronic tiredness.  At that time, she was taking Kaletra, Combivir, Bactrim, and Viread (R. 104, 106).

In February, 2004, plaintiff reported that she was recovering from an upper respiratory tract infection, that her cough had improved and that her weight had increased.  Her doctor formed the impression that she was doing well.  He adjusted her medications, discontinuing Bactrim DS and reducing the Colace (R. 301).

In March, 2004, plaintiff's physician reviewed her condition on follow-up.  He again indicated that plaintiff was doing well on her medication regimen and advised her on diet and exercise (R. 303).

In May, 2004, plaintiff's physician reviewed her condition on follow-up and again indicated that she was doing well.  Her Kaletra medicine was changed to Reyataz, and potential side effects were discussed, with instructions given for bilirubin level testing if signs of jaundice appeared.  After the new medication was started, plaintiff reported a couple of bumps on her skin but denied other side effects, such as shortness of breath, difficulty breathing, or problems swallowing (R. 305-306).

In July, 2004, plaintiff had no complaints on follow-up, describing mild numbness on the left elbow and shooting pain to the fingers.  She reported no rash, jaundice, swelling, inflammation, fever, chills, nausea, or vomiting.  Her physician formed the impression that she was doing well.  She was started on anti-inflammatory medication for the symptoms in her left arm (R. 307).

In August, 2004, plaintiff was seen for follow-up and requested a pregnancy test.  She denied symptoms of nausea, vomiting, headache, or photophobia (R. 309).  Her past history was

reported as "HIV/advanced AIDS, currently doing well" and her anemia was described as stable. Her pregnancy test was negative (R. 309, 328).

In September, 2004, plaintiff was seen for follow-up.  She described mild suprapubic discomfort and occasional increased urinary frequency in the past few days.  She denied symptoms of fever, chills, flank pain, nausea, vomiting, or difficulty with urination.  Her physician's report indicates that she was doing well with "HIV advanced AIDS," also described as HIV with a history of AIDS.  She was also diagnosed with tobacco abuse with early chronic obstructive pulmonary disease and was doing well on medications.  Her medications included Reyataz, Ritonavir, Viread, Advair, 3TC, Combivent, Feosol, and Colace (R. 311, 312).

In December, 2004, plaintiff was seen for follow-up.  She was doing well but complained of depression and sleep problems.  She was put back on medication for depression and was instructed to keep an appointment with the psychiatry department (R. 313-14).

At the January 24, 2005, hearing, plaintiff explained that she suffered from pain in her legs and hands, cramps, arm numbness, shortness of breath, eye problems, forgetfulness, problems maintaining concentration, fatigue and lack of energy, diarrhea, headaches, and poor bladder control.  She further explained that her symptoms caused her to wake constantly during the night and sleep frequently during the day.  At times, she did not feel well enough to get out of bed or dress.  She took medication prescribed for AIDS on a daily basis, as well as over-the-counter pain medicine, but had discontinued medicine for depression.  She lived alone and said she had worked sporadically because she was homeless for extended periods of time due to a serious drug addiction, currently in remission.  She had performed some volunteer work, cleaning and mopping for a couple of hours per day, for a short time.  She was able to care for her personal needs, clean her house, hand-wash her clothes, use a taxi service, occasionally

attend church services, and shop for groceries. (R. 358-381).   Some of the side effects she described might result from anti-retroviral medicine (R. 111-120, 458-463).

In April, 2005, plaintiff's mental status was assessed by Dr. Vincent.   During the interview, plaintiff reported that her symptoms had decreased with medication.   She described chronic bone pain; joint and muscle aches and soreness – particularly in her feet, hands, ankles and legs; and chronic weakness, fatigue, tiredness, low energy level, and exhaustion – to the point that she felt sleepy all the time and took frequent daytime naps.   She reported a poor quality of sleep, frequent urination, poor appetite, failing memory, and shortness of breath with exertion (R. 343-344).

In October, 2005, plaintiff was evaluated as a new patient at Koch Health Center.   She said she felt well and the evaluator formed the impression that she appeared well.   She received an influenza vaccine and was strongly encouraged to continue an uninterrupted regimen for her HIV disease.   She was referred to a urologist for incontinence and strongly encouraged to stop using cocaine and tobacco and to reduce her alcohol intake.   She was advised to follow a low fat and low cholesterol diet (R. 464-468).

 In January, 2006, plaintiff reported that she was unable to keep an appointment with a urologist because she did not have a medical card.   She said she tired easily with minimal activity and that she was home, sleeping most of the time.   She requested a note stating that she could not perform an 8-hour work shift.   She also described muscle cramping in her right leg and foot.   She reported shortness of breath and denied recent episodes of apnea.   Dr. Ajao thought she had fatigue with unclear etiology which could be multifactorial.   She could also have neuropathy, muscle cramps or an electrolyte imbalance.   Laboratory tests were ordered and she was provided with a note saying she should be allowed off work for medical problems (R. 468-69).

7

In April, 2006, plaintiff was seen for follow-up and reported that she had reverted to cocaine use.  Her laboratory reports showed a slight increase in viral load which Dr. Ajao thought might be secondary to a period of medication non-compliance.  Plaintiff reported that she had been compliant with medication for the past week (R. 470).

In September, 2006, plaintiff was seen for sore throat, incontinence, and occasional diarrhea.  She was treated for pharyngitis and referred to a gastroenterologist.  Dr. Ajao thought her drug regimen might need to be switched and that she had decreased her cocaine abuse (R. 471-473).

In January, 2007, plaintiff was evaluated for symptoms of coughing up blood.  A chest x-ray was ordered and she was encouraged to continue her current regimen (R. 474-75).

In February, 2007, plaintiff was evaluated for symptoms of cough, headaches, and congestion.  She was treated for bronchitis and advised not to interrupt her anti-retroviral therapy (R. 476-77).

In June, 2007, plaintiff was seen for follow-up.  She complained of toothache and reported weight gain and left foot pain. She was instructed to avoid all cocaine use, to stop smoking, to be fully compliant with her medications, and to decrease her caloric intake (R. 478-79).

In August, 2007, plaintiff was seen for sores on the roof of her mouth and swollen throat. She said she had not taken her medication for five days.  She was treated for ulcers on the palate and pharyngitis and advised to get back on her medication regimen.

In January, 2008, plaintiff complained of chronic diarrhea, hair loss, urinary and fecal incontinence, and difficulty sleeping.  She said she was not able to work and was not taking her medicine regularly because of forgetfulness.  She was encouraged to have a colonoscopy and a

trial of anti-incontinent agents was discussed.  Dr. Ajao thought her overal HIV condition would improve with medication compliance (R. 483-483).

On February 20, 2008, plaintiff testified and described multiple symptoms, including toothache, headache, leg and foot pain, muscle cramps, numbness, frequent urination, loss of bladder control, diarrhea, sleepiness, fatigue, mouth sores, and weight gain.  She said she reported her symptoms to Dr. Ajao, who recognized them as side effects of the medication that was controlling her HIV condition.  She also testified that Dr. Ajao told her she would be tired if she tried to work on a part-time basis (R. 574-594).

At the same hearing, medical evidence was presented by Dr. Ann Winkler.  Although she had not interviewed plaintiff or performed an examination, she had reviewed recent medical records.  Dr. Winkler did not think plaintiff suffered from AIDS.  She characterized plaintiff's ailment as a chronic HIV infection.  She explained that the meaning of the term "AIDS" depended on the person using the term but might describe someone with frequent opportunistic infections.  She thought plaintiff's ailments would restrict her ability to perform physical aspects of work and that environmental restrictions were also required.

On the issue of medications, Dr. Winkler confirmed that plaintiff's medications were powerful and very effective.  Dr. Winkler did not see "much reference" to side effects in plaintiff's clinical records but recognized the potential for the drugs to cause weakness, fatigue, muscle pain, fever, headache, joint pain, difficulty sleeping, and diarrhea.[2]  She would be "very careful" to avoid drug interaction with Reyataz because of how that drug was used.  An effort to "tailor" therapy might be tried if side effects were severe and frequent but because plaintiff had an excellent response to her current regimen, that would be a clinical decision.  She did not note

---

[2]  Dr. Winkler did not identify changes in body fat as a possible side effect of Reyataz. However, that potential side effect was identified in other evidence (R. 120).

any prescription for anti-diarrheal medicine or a recommendation for dietary changes in plaintiff's records (R. 555-573).

### III.    Legal Standards

To receive supplemental security income, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 1382c(a)(3)(b), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry that must be followed to determine whether a claimant is disabled. 20 C.F.R. § 416.920. The Commissioner must determine in sequence: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets or equals one listed by the Commissioner, (4) whether the claimant can perform his or her past work, and (5) whether the claimant is capable of performing any work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at Step 5 to show that the claimant can perform some other job. *Id.*

Murphy seeks an order reversing the Commissioner's decision and awarding benefits or remanding for further proceedings, claiming that the ALJ erred when he rejected her testimony regarding the side effects of her HIV medicine. Defendant responds that the ALJ's assessment of Murphy's testimony regarding her medication side effects is well-supported.

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a

mere scintilla" of proof.  The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Because the Commissioner of Social Security is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner.  *Id.*  However, the Court does not defer to conclusions of law, and if the Commissioner makes an error of law or serious mistakes, reversal is required unless the Court is satisfied that no reasonable trier of fact could have come to a different conclusion.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  Credibility assessments are accorded considerable deference.  They will be overturned only when "patently wrong."  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

## IV.    The Commissioner's Decision

The ALJ evaluated plaintiff's application through Step 5 of the sequential evaluation, finding that Murphy's multiple impairments, including HIV infection, did not meet or equal in severity a listed impairment, that her description of symptoms and limitations preventing sustained work activity was not credible, that she retained the ability to perform a reduced range of sedentary work, and that she was not disabled because she was able to perform a number of assembler jobs (R. 399-406).   In reaching these findings, the ALJ discredited evidence that plaintiff's symptoms and limitations were of sufficient severity to keep her from performing all sustained work activity.  The ALJ explained his credibility assessment in this manner:

> She may have had adverse side effects from medications when she initially took them, but the medical records from Dr. Badahman and from Dr. Ajao show her HIV to be in good control when she takes the medications, and her different side effects to have been allayed shortly after they initially appeared.

(R. 403).

11

## V.      ALJ Credibility Assessment

Murphy maintains that the ALJ failed to assess credibility in compliance with the applicable legal standard by (1) considering the entire record and (2) applying the legal standard to the evidence in a meaningful way.  Defendant suggests that these positions were evaluated and "soundly rejected" in the prior litigation (Doc. No. 33. p. 9-10).

The regulations provide that all of the available evidence will be considered and weighed when the intensity and persistence of symptoms is evaluated.  20 C.F.R. 416.929(c)(2).  The Commissioner's policy for assessing the credibility of an individual's statements is described in Social Security Ruling 96-7p.  ALJs must carefully consider an individual's statements about symptoms with the rest of the relevant evidence.  SSR 96-7p.  The credibility of an individual's statements is to be determined by considering all of the evidence concerning the symptoms and how the symptoms affect the individual's ability to work, including medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions; statements and reports from the individual and from treating or examining physicians and other persons about the individual's medical history, treatment and response; prior work record and efforts to work; and daily activities.  *Id*.  Because consistency is one strong indication that an individual's statements can be accepted as true, ALJs must compare statements made by an individual in connection with his or her claim, evaluate the consistency between such statements and with other information, and determine whether variations in the statements are explained.  *Id*.  All credibility determinations "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p.  Once Murphy produced medical evidence of her HIV AIDS impairment, her testimony regarding her symptoms could not be rejected merely because the symptoms are unsupported by objective evidence. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th

Cir. 2004). Credibility assessments that are based on serious errors must be remanded. *Id*. at 754.

Defendant's reliance on the prior litigation is misplaced. The prior decision was reversed and remanded on judicial review and then vacated by the Appeals Council on remand. The March 7, 2008, decision is now the Commissioner's final decision on Murphy's application for supplemental security income. Accordingly, the ALJ's analysis of plaintiff's credibility is considered anew.

The Court has carefully reviewed the ALJ's report and is not assured that all of the relevant evidence was evaluated or that the ALJ considered the nature and extent of plaintiff's ailments and her various symptoms and assessed the extent to which her symptoms affected her ability to perform sustained work tasks throughout the relevant time period. The general reference to medical records submitted by Drs. Badahman and Ajao does not demonstrate that the ALJ considered the reports in light of other relevant information, including plaintiff's multiple reports of symptoms; medical and third party reports reflecting a variety of ailments and symptoms; laboratory tests, hospitalization records, and treatment efforts; reports describing restricted daily activities; and information suggesting that the benefit of successful drug therapy might outweigh the side effects. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)(requiring ALJ to assess credibility in light of all the evidence of record and recognizing that some patients may not complain because the benefits of a particular drug outweigh its side effects).

Remand for a new decision including reevaluation of Murphy's credibility in accordance with SSR 96-7p is warranted under these circumstances. The Court has considered Murphy's request that her case be remanded for an award of benefits. That argument is rejected at this time

but should receive very strong consideration if Murphy's credibility is not evaluated in accordance with the applicable legal standard on remand. The Appeals Council should be directed to assign the case to an ALJ who has not previously assessed and formed an opinion about the evidence. In light of the legal error in the analysis, the undersigned does not reach the question of whether the findings are supported by substantial evidence.

### VI.    Conclusion

IT IS RECOMMENDED that the Commissioner's March 7, 2008, decision denying Alicia M. Murphy's application for supplemental security income be REVERSED and REMANDED for further proceedings consistent with this report.

**SUBMITTED**:  **February 10, 2010**  .

**S/ Philip M. Frazier**
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**